**STATE FARM AND CASUALTY COMPANY, Plaintiff,**

v.

**Fred Carl SANDERS, and Jan M. Faber, individually and as Administratrix of the Estate of Matt J. Faber, Deceased, Defendant.**

No. IP 90–1829 C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 14, 1992.

John Beeman, Patricia Polis McCrory, Harrison & Moberly, Indianapolis, for plaintiff.

Douglass R. Shortridge, John C. Ruckelshaus, Ruckelshaus Roland Hasbrook & O'Connor, Indianapolis, for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BARKER, District Judge.

This matter comes before the Court on the plaintiff's Complaint for Declaratory Judgment and Request for Trial by Jury (with attached exhibits), filed pursuant to 28 U.S.C. §§ 1332 and 1441, and Rule 57 of the Federal Rules of Civil Procedure, defendant Jan Faber's Answer, defendant Fred C. Sanders' Answer and Compulsory Counterclaim, plaintiff/counterclaimant State Farm's Answer, Affirmative Defenses and Request for Trial by Jury to Defendant/Counterclaimant Sanders' Counterclaim, Magistrate Judge J. Patrick Endsley's Entry of November 13, 1991, which granted State Farm's Motion to Strike the "bad faith allegation" in defendant Sanders' Counterclaim, the plaintiff's Motion for Summary Judgment, Memorandum in Support thereof, Submission of Evidence in Support of Motion for Summary Judgment, and related papers, defendant Sanders' Answer Brief in Opposition to the plaintiff's Motion, Verification of defendant Sanders' Affidavit in Opposition to the plaintiff's Motion, Affidavit of Douglass R. Shortridge in Opposition to the plaintiff's Motion, defendant Sanders' Citation of Additional Authority in Opposition to plaintiff's Motion, and the plaintiff's Reply Brief.

The Court having considered the foregoing pleadings and papers, and being duly advised, concludes that the State Farm's Motion for Summary Judgment must be granted. The Court finds that the insurance policy issued by State Farm and Casualty Company to Fred Carl Sanders (Policy No. 14-09-5329-1) excludes coverage for Sanders' potential liability in *Faber v. Sanders,* Cause No. 41C01-8908-CP00231F, which is pending in the Johnson County (Indiana) Circuit Court. Plaintiff State Farm and Casualty Company shall not be required to defend or indemnify defendant Sanders in said action. Sanders shall take nothing by way of his counterclaim.

IT IS SO ORDERED.

## MEMORANDUM ENTRY

### I. *Factual Background*

On or about July 1, 1988, State Farm Fire and Casualty Company (hereinafter "State Farm") issued a homeowners policy (policy number 14-09-5329-1) to Fred Carl Sanders (hereinafter "Sanders"), who then resided at 2968 Arthington Boulevard, Indianapolis, Indiana. *Defendant Sanders' Answer to Request No. 6 of State Farm's First Request for Admissions.* Sanders' policy, which was in effect from July 1, 1988, to and including July 1, 1989, contained the following pertinent provisions:

### HOMEOWNERS POLICY

#### Definitions

"You" and "your" mean the "named insured" shown in the **Declarations.** Your spouse is included if a resident of your household. "We", "Us" and "Our" mean the Company shown in the **Declarations.**

\* \* \* \* \* \*

SECTION II—LIABILITY COVERAGES

COVERAGE L—PERSONAL LIABILITY

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, caused by an **occurrence,** we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and,

2. provide a defense at our expense by counsel of our choice. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for damages, to effect settlement or satis-

fy a judgment resulting from the **occurrence** equals our limit of liability.

COVERAGE M—MEDICAL PAYMENTS TO OTHERS

We will pay the necessary medical expenses incurred or medically ascertained within three years from the date of an accident causing **bodily injury.** Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage applies only:

1. to a person on the **insured location** with the permission of an **insured;**

\*　　\*　　\*　　\*　　\*　　\*

SECTION II—EXCLUSIONS

1. Coverage L and Coverage M do not apply to:

a. **bodily injury** or **property damage:**

(1) which is either expected or intended by an **insured;** or

(2) to any person or property which is the result of willful and malicious acts of an **insured:**

\*　　\*　　\*　　\*　　\*　　\*

SECTION II—CONDITIONS

3. **Duties After Loss.** In case of an accident or **occurrence**, the **insured** shall perform the following duties that apply. You shall cooperate with us in seeing that these duties are performed:

a. give written notice to us or our agent as soon as practicable, which sets forth:

(1) the identity of this policy and **insured;**

(2) reasonably available information on the time, place, and circumstances of the accident or **occurrence;** and,

(3) names and addresses of any claimants and available witnesses;

b. immediately forward to us every notice, demand, summons, or other process relating to the accident or **occurrence;**

c. at our request, assist in:

(1) making settlement;

(2) the enforcement of any right of contribution or indemnity against a person or organization who may be liable to an **insured;**

(3) the conduct of suits and attend hearings and trials; and,

(4) securing and giving evidence and obtaining the attendance of witnesses.

\*　　\*　　\*　　\*　　\*　　\*

PERSONAL INJURY ENDORSEMENT

For the additional premium, under COVERAGE L—PERSONAL LIABILITY, the definition of bodily injury is amended to include personal injury.

"Personal Injury" means injury arising out of one or more of the following offenses:

1. False arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution;

2. Liable, slander, defamation of character or invasion of rights of privacy.

\*　　\*　　\*　　\*　　\*　　\*

Section II Exclusions does not apply to personal injury.

**Personal injury** does not apply:

\*　　\*　　\*　　\*　　\*　　\*

2. to injury caused by a violation of a penal law or ordinance committed by or with the knowledge or consent of any insured;

\*　　\*　　\*　　\*　　\*　　\*

7. to injury which is either expected or intended by you;

8. to any person or property which is the result of your willful and malicious act no matter at whom the act was directed[.]

*State Farm Homeowners Policy,* pp. 1, 12–14, 16 (attached as Exhibit A to *State Farm's First Request for Admissions* ); *Defendant Sanders Answer State Farm's First Request for Admissions,* p. 1, Request No. 1.

Sanders, who had been in the Navy from 1965 to 1968, served in Vietnam. *Sanders' Deposition of August 1, 1990,* p. 64 (attached as *Exhibit D* to *State Farm's Second Request for Admissions* ) (hereinafter "Sanders' Deposition"). He had owned a shotgun while he was growing up and was accomplished at skeet shooting. *Sanders'*

*Deposition,* pp. 92, 100. Sanders testified that he could "hit" twenty-five (25) out of twenty-five (25) on a "good day." *Id.,* p. 92. Sanders owned a number of guns including a Browning over and under shotgun, a Browning single shot shotgun, a Remington shotgun, a "foreign made" single shot shotgun, a twenty-two caliber rifle, and two pistols. *Id.,* p. 86.

On August 14, 1988, Sanders' dog, Luke, chased a boy who was riding his bicycle in the vicinity of Sanders' residence. *Sanders' Deposition,* pp. 121–222. The boy became frightened and jumped on top of a car that was parked in front of the house which was occupied by Sanders' neighbor, Perry Evans. Evans left his house to talk to the boy about what had happened, while Sanders sat on his porch. *Sanders' Deposition,* pp. 126–127. Sanders refused Evans' subsequent request to discuss what had occurred. *Id.,* at 121–122, 128. Evans then left the scene. *Id.,* at 134.

Approximately one hour later, Officer Matt J. Faber, of the Indianapolis Police Department, arrived in his police car and talked to Evans. *Sanders' Deposition,* p. 135. Officer Faber then walked to Sanders' house and attempted to engage Sanders in a discussion about Sanders' dogs and the leash laws. *Id.,* at 136, 139. Sanders responded by agreeing to keep his dogs "p[e]nned up." *Id.,* at 139. When Officer Faber remarked that Sanders would not like it if his neighbors permitted their dogs to run loose, Sanders said, "What the hell is going on?" *Id.,* at 139–140. Sanders inquired of Faber whether he was under arrest, and Faber told him that he was not. *Id.* When Sanders told Evans, "Look nigger, there's no need to be starting a bunch of trouble," Officer Faber told Sanders there was no need to "say anything" to Evans. *Id.,* at 145.

Sanders then informed Officer Faber that he (Faber) did not know the "history of the situation [between Sanders and Evans]," and that Faber should stay out of it. *Id.,* at 147. Sanders then requested and was given Officer Faber's name and badge number. *Id.* Again, Sanders asked if he was under arrest. *Id.* When Faber told him that he was not under arrest, Sanders began walking away, telling Officer Faber that he was going in his house. *Id.,* at 148. Officer Faber told him not to. *Id.* While Sanders was standing in the doorway of his house, Officer Faber grabbed him and attempted to keep him from entering the house. *Id.,* at 149.

When Officer Faber was unable to enter the Sanders' house, he told Sanders that he was calling for backup. *Sanders' Deposition,* pp. 159–160. Sergeant Knapp responded and, after arriving at the scene, asked Sanders to "[c]ome on out and talk," but Sanders refused. *Id.,* at 167. Eventually, the officers broke down the door. *Id.,* at 182–185. Sanders proceeded to the back bedroom of his house where he kept one of his shotguns, which he picked up and inspected, by breaking the breech and observing a shell inside, to determine that it was loaded. *Id.,* at 182–183.

Sanders exited his bedroom and entered the hallway, almost bumping into Officer Faber in the process. *Id.,* at 185. Sanders, while standing approximately three feet (the approximate length of his shotgun) from Officers Faber, Knapp and Fender, brought up his shotgun to fire. *Id.,* at 187. Officer Faber turned and said, "Oh, my god, oh, shit." *Id.,* at 194. Intending to hit Officer Faber in the chest, Sanders fired. *Id.* Sanders later testified that his intent, at the time he fired, was to "defend [himself] from these men who had invaded [his] home and inflicted serious injury on [him]." *Supplemental Affidavit filed February 19, 1992,* p. 3.

Officer Faber was transported to Wishard Memorial Hospital in Indianapolis where he received emergency treatment. He remained in intensive care until August 23, 1988, when he died from "complications from a shotgun wound." *Coroner's Report,* p. 1 (attached as *Exhibit A* to *State Farm's Second Request for Admissions*). On the following day, an autopsy was performed by Marion County Coroner Dennis J. Nicholas. *Id.* Nicholas ultimately concluded that (1) Faber had been shot in the back, and (2) his cause of death was "RESPIRATORY FAILURE due to SHOTGUN

WOUND OF CHEST." *Id.,* pp. 1–2 (and attached *Autopsy Report,* p. 1).

Sanders was subsequently charged with one count of Murder, two counts of Class A felony Attempted Murder, and one count of Class D felony Resisting Arrest (with an injury) (Cause No. 49G02–8808–CF–92694). On January 31, 1989, Sanders pleaded guilty in the Marion County (Indiana) Superior Court to one count of Class C felony-Involuntary Manslaughter, pursuant to a written plea agreement he had entered into with the State of Indiana four days earlier. *Guilty Plea Hearing Transcript* (attached as *Exhibit D* to *State Farm's First Request for Admissions*). *See* Indiana Code 35–42–1–4. At the time Sanders' plea was entered, former Marion County Prosecutor Stephen Goldsmith read the Affidavit for Probable Cause into the record in order to establish the factual basis for Sanders' plea. Sanders acknowledged that the factual basis was correct, specifically admitting the following facts pertaining to the shooting:

> Again, the subject was grabbed by Officer Faber, when the door opened enough, but again lost his grip and balance, falling to the floor. At this time, the subject fled backwards, towards the bedroom, reappearing with a 12 gauge shotgun and *fired one blast at the officer* as he was getting off the floor, striking him in the upper back.

*Guilty Plea Hearing Transcript,* pp. 18, 21 (*Exhibit D* to *State Farm's First Request for Admissions*) (emphasis added). On March 3, 1989, Sanders was sentenced to a seven-year term of imprisonment. *State v. Sanders,* 587 N.E.2d 166, 168 (Ind. App.1992).

On May 4, 1989, Officer Faber's wife, Jan M. Faber, who was also an Indianapolis Police Department officer, filed a wrongful death action in the Marion County Superior Court (Cause No. 49D07–8905–CP–0598). *Complaint* (attached as *Exhibit B* to *State Farm's First Request for Admissions*). She alleged, *inter alia,* that Sanders had deprived her of her husband's care, love, affection, companionship, comfort and services, when he shot and killed Officer Faber. *Id.,* pp. 1–2. The wrongful death action was thereafter venued to the Johnson County (Indiana) Circuit Court, where it is now pending.

On May 24, 1989, State Farm Claim Superintendent Larry M. Davidson sent a certified letter to Sanders acknowledging State Farm's receipt of the Complaint, which had been filed in the wrongful death action, and informing Sanders that State Farm "decline[d] responsibility" for defending him in that action. *Letter of May 24, 1989* (attached as *Exhibit C* to *State Farm's First Request for Admissions*); *Defendant Sanders' Answer to Request No. 3 of State Farm's First Request for Admissions*). While Davidson indicated that State Farm would be investigating further, he specifically noted that State Farm reserved its right to deny coverage to Sanders and anyone else making a claim under the policy because there remained questions as to whether the policy requirements were met as the result of Sanders' late reporting of the loss, and as to whether coverage was precluded as a result of the expected or intended injury exclusion. *Id.* A similar letter was sent to Sanders on July 19, 1990, which stated as follows:

> Please understand, *the decision to pay the defense expense does not waive any of the coverage issues asserted in our letter dated May 24, 1989.*

*Letter of July 19, 1990* (attached as *Exhibit C* to *State Farm's Second Request for Admissions*) (emphasis added).

On September 18, 1990, State Farm filed its Complaint in this action seeking a declaratory judgment and jury trial, contending that Sanders is not entitled to coverage under his homeowners policy because several of the policy exclusions, including the intended/expected injury exclusion, are applicable and bar any payment of benefits. State Farm has now moved for summary judgment.

On October 24, 1990, Sanders filed a verified Petition for Post Conviction Relief in the Marion County (Indiana) Superior Court, alleging that his guilty plea was not knowingly, voluntarily or intelligently entered because "neither the State of

Indiana, the Court, nor [his] counsel, furnished [him] in writing or read to [him] an information setting out the crime to which [he] was pleading guilty," and alleging further that he was not informed of the elements of the offense. *State v. Sanders,* 596 N.E.2d 225, 226 (Ind.1992). The Marion County Superior Court granted Sanders' Verified Petition for Post–Conviction Relief, concluding that Sanders had "not received real notice of the true nature of the crime of involuntary manslaughter and was under the mistaken impression that self-defense was not available as a defense to involuntary manslaughter." *State v. Sanders, supra,* 587 N.E.2d at 167.

On February 27, 1992, the Indiana Court of Appeals affirmed the Marion County Superior Court's ruling. *Id.* However, on July 20, 1992, a unanimous Indiana Supreme Court vacated the Indiana Court of Appeals' Opinion, reversed the trial court, and remanded with instructions to the trial court to deny Sanders' Petition for Post Conviction Relief. *State v. Sanders, supra,* 596 N.E.2d at 225, 228.

### II. *Discussion and Decision*

#### A. Subject Matter Jurisdiction

■ The first issue which must be resolved is whether the Court has jurisdiction over the parties' dispute. Diversity jurisdiction exists where a dispute exists between citizens of different states and the amount in controversy exceeds $50,000. *See* 28 U.S.C. § 1332(a)(1) (1988); *State Farm Mutual Automobile Insurance Company v. Conway,* 779 F.Supp. 963, 967 (S.D.Ind.1991). In the present case, both requirements are satisfied. The diverse citizenship requirement is satisfied because the plaintiff is incorporated under the laws of, and has its principle place of business in, the State of Illinois, and both defendants are citizens of the State of Indiana. *Complaint,* p. 1, ¶ 1–2; *Defendant Sanders' Supplemental Answer to Plaintiff's Interrogatories,* p. 2 (Answer to Interrogatory 1(A)); *Pretrial Conference Report and Order of July 25, 1991,* p. 3, § 2. *See Galva Foundry Co. v. Heiden,* 924 F.2d 729–730 (7th Cir.1991); *Halmos v. Pan American World Airways, Inc.,* 727

F.Supp. 122, 124 (S.D.N.Y.1989) (*citing Strawbridge v. Curtiss,* 7 U.S. (Cranch) 267, 2 L.Ed. 435 (1806), and 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure, Jurisdiction 2d,* § 3605, p. 74 (1991 pocket part)).

The amount in controversy requirement is also satisfied. Although Sanders initially suggested that the wrongful death action now pending in the Johnson County Circuit Court could not satisfy the $50,000 requirement because the Complaint filed by Jan M. Faber in that action did not state a valid claim for loss of love, affection and support, *Defendant Sanders' Answer,* p. 2, ¶ 5; *Defendant Sanders' Answers to Interrogatories* (attached as *Exhibit A* to *Defendant Sanders' Notice of Compliance With Discovery Request Order*), pp. 8–9 (Answer to Interrogatory No. 15), Sanders has since conceded that the amount in controversy requirement is satisfied and that the Court has jurisdiction. *Pretrial Conference Report and Order of July 25, 1991,* p. 3, § 2; *Defendant Sanders' Contentions of Fact and Law,* p. 3, ¶ 1. The Court has considered the precise nature of the remaining claim in Jan M. Faber's wrongful death action and finds that it does not appear to a legal certainty that it involves an amount less than $50,000. *See Work v. United States Trade, Inc.,* 747 F.Supp. 1184, 1187–1188 (E.D.Va. 1990) (*citing St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 288–289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938)).

#### B. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure states in pertinent part that summary judgment shall be granted forthwith if the pleadings and discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In determining whether a genuine issue of material fact exists, the trial court must view the record and all *reasonable*

inferences drawn therefrom in the light most favorable to the nonmoving party. *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir.1989). At the summary judgment stage, the trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511.

"A genuine issue of material fact exists only where 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Wolf v. Fitchburg*, 870 F.2d 1327, 1329 (7th Cir. 1989) (*quoting Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511). Furthermore,

> Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.... [T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.

*Anderson*, 477 U.S. at 256–257, 106 S.Ct. at 2514; *see First Bank Southeast, N.A. v. Predco, Inc.*, 951 F.2d 842, 846 (7th Cir. 1992).

### C. The Intended/Expected Injury Exclusion

#### 1. *State Farm's Complaint for Declaratory Judgment*

State Farm argues that it should not be required to defend or indemnify Sanders if Jan Faber prevails in the wrongful death action because more than one of the exclusions contained in Sanders' homeowners policy has application in this case. The Court concludes that State Farm is entitled to summary judgment based upon the intended/expected injury exclusion, making it unnecessary to resolve the applicability of either the willful and wanton act exclusion or the criminal act exclusion.[1]

■ A federal court sitting in diversity applies the substantive law of its forum state. *State Farm Mutual Automobile Insurance Company v. Conway, supra*, 779 F.Supp. at 967. Thus, in resolving the issue of whether an insurance company has the duty to defend or indemnify a defendant in a civil action which is brought in an Indiana court, this Court applies Indiana law.

■ The general principles which are applicable in the present context are well-settled:

> "An insurance company is free to limit its liability in any manner not inconsis-

---

1. The validity of Sanders' guilty plea was not finally resolved by the Indiana Courts until July 20, 1992, when the Indiana Supreme Court vacated the Court of Appeals' Opinion, reversed the trial court, and remanded with the instruction that Sanders' verified Post Conviction Relief Petition be denied. *State v. Sanders*, 596 N.E.2d 225, 228 (Ind.1992). This may well be the reason counsel have not briefed the issue of the applicability of the criminal act exclusion which is contained in Sanders' Homeowners Policy. While the Court has not had the benefit of the parties' arguments regarding this exclusion, and therefore declines to use it as a basis for its decision, it is noted that the criminal act exclusion would appear to be satisfied in this case.

The criminal act exclusion, found in the Personal Injury Endorsement to Sanders' policy, provides as follows:

Personal injury does not apply:
* * * * * *
2. to injury caused by a violation of a penal law or ordinance committed by ... any insured[.]

Personal Injury Endorsement to Sanders' Homeowners' Policy.

This exclusion appears applicable, given the fact that Officer Faber's injuries (and ultimately his death) were clearly caused by Sanders' commission of Class C felony-Involuntary Manslaughter. *See Allstate Insurance Co. v. Norris*, 795 F.Supp. 272, 275–276 (S.D.Ind.1992). In *Allstate*, Judge McKinney construed an exclusion which provided that injuries resulting from any "criminal act or omission" by the insured were not covered. *Id*. The insured had pleaded guilty to "felony criminal recklessness," and the Court, applying Indiana law, thus found that the exclusion applied. *Id*. Judge McKinney specifically observed that the insured's homeowners' policy was not void for having excluded criminal acts which were merely reckless (rather than intentional). *Id*.

tent with public policy, and an unambiguous exclusionary clause is ordinarily entitled to construction and enforcement. *West American Insurance Co. v. McGhee* (1988), 530 N.E.2d 110, 111, *reh. denied, trans. denied.* This is also true for clauses that exclude liability for acts intentionally caused by the insured, since it is sound public policy to not permit insurance against harms that a person may intentionally cause. *Id.*

*City of Muncie v. United National Insurance Company,* 564 N.E.2d 979, 982 (Ind. App.1991); *see also* James L. Rigelhaupt, Jr., J.D., Annotation, *Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected By Insured,* 31 A.L.R.4th 957, § 7 (1991). These general principles permit policy limitations relating to "intended" and "expected" acts, the definitions of which are contained in the insurance policy at issue in this case:

> [The intent aspect] is met either by showing an actual intent to injure, or by showing the nature and character of the act to be such that an intent to cause harm to the other party must be inferred as a matter of law.

> "Expected" injury means injury that occurred when the insured acted even though he was consciously aware that harm was practically certain to occur from his actions. However, the definition of "expected" does not exclude harm that the insured "should have anticipated," i.e., objective proof of negligence. Consciousness of the likelihood of certain results occurring is determined by examination of the subjective mental state of the insured.

*Trisler v. Indiana Insurance Company,* 575 N.E.2d 1021, 1024 (Ind.App.1991) (citations omitted); *see Bolin v. State Farm Fire and Casualty Company,* 557 N.E.2d

1084, 1087 (Ind.App.1990) ("[T]he statement that there was a chance that [the insured] could hurt someone is a far cry from the definition we adopt today: a conscious awareness that such results are practically certain to occur."). The Indiana courts have recently decided several cases which provide guidance with respect to the scope of exclusions incorporating the concept of "expected or intended injury."

In *Hawkins v. Auto–Owners (Mutual) Insurance Company,* 579 N.E.2d 118, 119–121 (Ind.App.1991), an individual named Stephens shot another individual and was convicted of attempted murder. Stephens' insurance company brought a declaratory judgment action claiming that it was not liable under Stephens' policy because it excluded "bodily injury or property damage *expected or intended by an insured person*" (emphasis added). The trial court denied the insurance company's motion for summary judgment, finding that a genuine issue of material fact existed with respect to whether the shooting was intentional or negligent. *Id.* Ultimately, however, the trial court entered judgment on the merits in the insurance company's favor based upon the transcript of Stephens' criminal trial (the same judge had presided over the criminal trial).

The *Hawkins* Court held that the trial court had correctly denied the insurance company's motion. It agreed that Stephens' claim that his gun had discharged accidentally raised a genuine issue of material fact as to whether the shooting was intentional. *Id.,* 579 N.E.2d at 120. While the Court of Appeals' conclusion with respect to the denial of summary judgment was arguably *dicta,* given the fact that the trial court had entered judgment "on the merits" *after* denying the plaintiff's Motion,[2] *Hawkins* provides an example of a

---

2. As noted above, in *Hawkins* the trial court entered judgment based solely upon its review of the transcript of the Stephens' criminal trial. The Indiana Court of Appeals' reversal of the trial court's judgment "on the merits" was based in part upon the general rule that a criminal record of proceedings is not admissible in a subsequent civil action for damages "occasioned by the offense for which the party was convict-ed" to prove the facts established in the criminal action. *Id.,* 579 N.E.2d at 121. Writing for the Court, Judge Buchanan observed that "[t]he trial court's action in denying summary judgment because a genuine issue of material fact existed and then jumping the gap between denial of summary judgment and trial of the issue presented by then deciding the issue, is somewhat puzzling." *Id.,* 579 N.E.2d at 120.

situation in which a trial was required to enable the court to resolve the factual dispute over an insured's state of mind.

A similar exclusion was at issue in *Auto–Owners (Mutual) Insurance Company v. Stroud*, 565 N.E.2d 1093, 1094–1096 (Ind. App.), *trans. den.* (1991). In *Stroud*, a store owner's son (Stroud) decided to spend the night in his mother's store, in part because there had been three attempts to burglarize the store in less than a month. Armed with a shotgun, Stroud was awakened at approximately 11:30 P.M. by the sound of an unidentified individual attempting to pry open a door to the building. *Stroud, supra,* 565 N.E.2d at 1094. Stroud aimed the shotgun at a point approximately a foot and a half from the bottom of the door and fired, wounding an eleven-year-old boy who was on the other side. *Id.* Stroud claimed that he had aimed low because he wanted to scare away the burglar(s), and that he did not intend to hurt anyone. After the boy's parents filed suit, the store owner's insurance company sought a declaratory judgment relieving it of the obligation to defend or indemnify under the terms of its policy because the injury was "expected [or] intended from the standpoint of the accused." The trial court denied the insurance company's motion for summary judgment and conducted a bench trial. Ultimately, the trial court entered judgment against the insurance company, and the Indiana Court of Appeals affirmed.

The *Stroud* Court concluded, over the dissent of Judge Hoffman, that Stroud's act of shooting at the door, despite his awareness of the fact that someone was on the other side, was *not* "expected [or] intended from the standpoint of the insured [ (i.e., that the company had the obligation to defend and indemnify the son because the exclusion did *not* apply) ]." *Id.,* 565 N.E.2d at 1094. The Court observed that while the evidence was indeed conflicting, it was not the prerogative of a reviewing court to reweigh the evidence or judge the credibility of witnesses. *Id.,* 565 N.E.2d at 1094–1095. Noting that the trial court's judgment was supported by the facts and inferences contained within the record, the

majority reasoned that Stroud had not committed an act that required, as a matter of law, the inference of "intent to injure." *Stroud, supra,* 565 N.E.2d at 1096. The majority also held that the trial court had not erred in concluding that the victim's injury was not "expected," stating that "[the Court] cannot say [Stroud] had a conscious awareness that an injury was practically certain to occur." *Id.*

Significantly, in reaching the conclusion that Stroud had not committed an act that required the Court to draw an inference of "intent to injure" as a matter of law, the Indiana Court of Appeals reasoned as follows:

> This case is factually distinct from cases in which the injury-producing act was aimed directly at a victim. For example, in [*Allstate Insurance Co. v.] Herman,* [551 N.E.2d 844, 845–846 (Ind.1990) ], an intent to injure was inferred from the insured's deliberate act of shooting a gun into a crowd of people. The insured fired four shots at people whom he could see fleeing his home. *Id.* In *Home Insurance Co. v. Neilsen* (1975), 165 Ind. App. 445, 332 N.E.2d 240, there was an intent to harm when the insured struck another person with his fist. In *Bolin [v. State Farm Fire and Casualty Co.* (1990), Ind., 557 N.E.2d 1084, 1085–1090], however, intent or expectation was not established as a matter of law. In that case, the insured shot a gun at a truck on a highway, injuring the driver. The insurance policy contained exclusionary language identical to that in the instant case. This court reversed the summary judgment in favor of the insurance company and held that the nature of the insured's act was not such that harm to the truck driver must have been expected or intended as a matter of law. *Bolin, supra.* The court distinguished *Bolin* from cases where an inference of intent is permitted to be drawn from the act itself because "in those cases the injury producing act was aimed directly at the victim or at another person." *Id.* at 1089. Here, [the store owner's son] shot at the lower part of a door, not knowing

exactly what was behind the door. He did not shoot directly at a person. *Stroud, supra,* 565 N.E.2d at 1096.[3]

■ The intended/expected injury exclusion which is at issue in this case provides that "Coverage L [ (personal liability) ] and Coverage M [ (medical payments to others) ] do not apply to [ ... ] **bodily injury** [ (including personal injury) ] or **property damage** [ ... ] which is either expected or intended by an insured[.]" *Sanders' Homeowners Policy,* pp. 13 (and separate page containing personal injury endorsement). Viewing the undisputed facts and reasonable inferences therefrom, considered in the light most favorable to Sanders (the nonmoving party), the Court concludes that as a matter of law the terms of the exclusion are satisfied in this case. Sanders' own testimony was that he intended to fire his shotgun at Officer Faber and the other officers, making Officer Faber's injuries clearly "expected or intended."

The Indiana Supreme Court's decision in *Allstate Insurance Co. v. Herman,* 551 N.E.2d 844 (Ind.1990), provides support for State Farm's position which the Court adopts in this decision. In *Herman,* the injury-producing act was aimed directly at a group of individuals who were attempting to flee. *Id.,* 551 N.E.2d at 845–846. Writing for the *Herman* majority, Justice Given observed as follows:

> There can be no doubt from the evidence in this case that Heroy deliberately fired four shots into a crowd of fleeing people of which Herman was a member. Although there is no evidence he intended to specifically shoot Herman, he certainly had the intention of shooting into the fleeing crowd with the intent "to hurt somebody."

*Id.,* 551 N.E.2d at 845.

Sanders does not appear to claim, as did the insured in *Hawkins,* that his weapon

discharged accidentally, despite a reference by him in his deposition that he thought at the time of the shooting that he might have tripped. Sanders' central contention is that he was merely defending himself when he shot Officer Faber. *Defendant Sanders' Contentions of Fact and Law,* p. 2, ¶ 6; *Defendant Sanders' Answer Brief,* pp. 2–3. Sanders' claim that he was acting in self-defense, however, is inconsistent with the notion of accidental discharge and simply does not "transform his attack into a non-volitional act." *State Farm Fire and Casualty Co. v. Miles,* 730 F.Supp. 1462, 1467 (S.D.Ind.1990), *aff'd,* 930 F.2d 25 (7th Cir.1991) (unpublished) (citing *Home Insurance Co. v. Neilsen,* 165 Ind.App. 445, 332 N.E.2d 240, 244 (1975)).

In *State Farm Fire and Casualty Co. v. Miles,* an insured (Miles) went to the apartment where the woman he had been dating (Carey) resided. Miles was armed with a hammer in order to "protect himself" from Carey's male companion (Summerfield), who was also present in the apartment. *Id.,* 730 F.Supp. at 1464. Miles apparently believed that such extra protection was necessary because Summerfield was a former Marine. *Id.* Miles and Summerfield became engaged in a "confrontational" conversation, which ended when Miles asked Carey if he could use her bathroom. *Id.* While in the bathroom, Miles removed the hammer from his pocket. He then left the bathroom, approached Summerfield, and struck him on the head with the hammer. *Id.,* 730 F.Supp. at 1464–1465. Charged with Class A felony Attempted Murder, Miles pleaded guilty to Class C felony Battery. *Id.,* 730 F.Supp. at 1465. In the subsequent civil action (wherein Miles admitted negligence), Summerfield obtained a judgment for $75,000. Miles' insurance company (State Farm) filed a de-

---

3. In his dissenting opinion, Judge Hoffman suggested that Stroud's intent to injure was established "when he fired at a door knowing someone was on the other side." *Stroud, supra,* 565 N.E.2d at 1097. Judge Hoffman stated that in his opinion the trial court's finding that the son had only intended to scare the burglar(s) was clearly erroneous because Stroud "could have fired at the ceiling or in the floor rather than

directly at the door." *Id.* Judge Hoffman continued, noting that even if the trial court had not erred with respect to the issue of "intent," its finding that the son did not expect to cause injury was clearly erroneous. *Id.* Judge Hoffman reasoned that "[r]easonable persons would certainly expect injury to occur [when firing a shotgun at a door they were aware someone was behind]."

claratory judgment action based in part on the presence of an intended or expected injury exclusion in Miles' homeowners policy. Miles claimed that he had brought the hammer to Carey's apartment to protect himself from Summerfield (i.e., that he had acted in self-defense). *Id.*, 730 F.Supp. at 1467.

Judge Tinder observed in *Miles* that an "[insured's] opportunity to argue that he acted in self-defense came in the state criminal and civil actions" because "[o]nly in those actions were the *motivations* for the attack at issue (i.e., self-defense, duress)." *Miles, supra,* 730 F.Supp. at 1467 (emphasis original). Analyzing an exclusion which was identical to the exclusion in the present case, Judge Tinder explained that questions of motivation are *not* relevant in a declaratory judgment action which centers on the issue of expected or intended injury. *Id.* Judge Tinder noted that the Indiana Court of Appeals had reached the same conclusion in *Neilsen* based upon the following reasoning:

> *The question of self-defense* is a standard of [the defendant's] liability to [the injured third party]. It presents an issue of motive or justification for an intentionally caused harm, but it *does nothing to avoid the inference of intent to harm that necessarily follows the deliberate blow* to the [injured third party's] face.

*Id.*, 730 F.Supp. at 1467 (*quoting Home Insurance v. Neilsen, supra,* 332 N.E.2d at 244) (emphasis added; brackets in original). The Court concludes that the reasoning in *Miles* and *Neilsen* is dispositive of Sanders' claim that the intended or expected injury exclusion in his homeowners policy is not satisfied because he acted in self-defense when he shot Officer Faber.

A careful reading of Sanders' depositions and affidavits, particularly his affidavit of February 4, 1992 (filed in this action on February 19, 1992), establishes that he voluntarily discharged his gun, that his intent at the time he fired remained the same as it had been shortly after the officers entered his residence (he wanted to stop the officers who he then perceived as a threat), and that the "injury-producing act" was directed toward Officer Faber and the other officers.

In summary, the intended or expected injury exclusion which is contained in Sanders policy is satisfied because Sanders' act of raising his shotgun and firing at Officer Faber was a volitional act, and Officer Faber's injuries were clearly intended or expected by Sanders.

### 2. *Sanders' Counterclaim*

In Sanders' Answer to State Farm's Complaint, he asserts a Counterclaim pursuant to Rule 13(a) of the Federal Rules of Civil Procedure. In pertinent part, he alleges that:

> 3. State Farm has breached its duty to Sanders by failing to act in good faith and investigate and defend the action brought against him by Jan M. Faber, Administratrix of the Estate of Matt J. Faber. Rather than investigate the claim and interview the insured with a view toward finding coverage, State Farm selectively investigate public documents with a view toward excluding coverage.

> \*    \*    \*    \*    \*    \*

> 6. Under the terms of the policy, State Farm should be declared to have coverage to defend under the terms of its policy as well as pay any judgments thereunder, pay for the damage to [Sanders'] home and loss of personal property, to pay for costs and expenses incurred by Sanders in defending the Faber complaint as well as this Complaint, and for punitive damages for bad faith in order to deter State Farm from like conduct against other insureds.

*Defendant Sanders' Answer*, pp. 4–5. On May 29, 1991, State Farm filed its Motion to Strike and/or Motion to Dismiss for Failure to State a Claim. State Farm argued that the bad faith allegation should be stricken or dismissed because the Indiana courts have not recognized an independent tort of "bad faith" under Indiana law. *State Farm's Motion to Strike or Dismiss*, pp. 1–2 (*quoting Liberty Mutual Insurance Company v. Parkinson,* 487 N.E.2d 162, 164–165 (Ind.App.1985)).

Magistrate Judge J. Patrick Endsley granted State Farm's Motion to Strike on November 13, 1991, observing that the defendants had failed to respond or request an enlargement of time in which to do so. *Entry of November 13, 1991,* p. 1. The Entry provided that "the 'bad faith' allegation in paragraph six (6) of Sander[s'] counterclaim is hereby **STRICKEN**." *Id.* (emphasis original). Inasmuch as Sanders did not appeal the Magistrate Judge's decision, the Court concludes that the issue of bad faith is no longer a part of this litigation.

Given the fact that bad faith is no longer an issue in this case, Sanders' counterclaim is reduced to the single contention that State Farm is obligated to defend and indemnify him. The Court's conclusion announced above regarding indemnification, however, is that State Farm is not required to indemnify Sanders because the intended or expected injury exclusion is applicable and has been satisfied given the facts. State Farm has no obligation to honor or fulfill Sanders' request for payment for property damages because Sanders has yet to file a Proof of Loss or Inventory for damage to his home or personal property, despite the passage of more than four years since the events causing the damage and the requirements of his policy. *State Farm's Second Request for Admissions,* p. 7 (Requests II(2) and (3)).[4]

The Court finds Sanders' argument regarding State Farm's duty to defend not to be persuasive in light of Sanders' failure to object in a timely fashion to State Farm's express reservation of rights. State Farm correctly notes that, even if Sanders' counsel did enter into an oral agreement with Claim Superintendent Davidson for State Farm to pay attorney fees and allow Sanders to file an untimely informal proof of loss, *see Affidavit of Douglass R. Shortridge in Opposition to State Farm's Motion for Summary Judgment,* pp. 2–4 (which State Farm expressly does not admit but assumes solely for purposes of the pending Motion), such an agreement would be meaningless in view of the fact that Sanders has failed to present evidence to establish that he or his counsel informed State Farm of Sanders' disagreement with the May 24, 1989 and July 19, 1990 Reservation of Rights letters. *Ohio Casualty Insurance Co. v. Rynearson,* 507 F.2d 573, 580 (7th Cir.1974).

Thus, the Court finds that the portion of Sanders' counterclaim which survived the Magistrate Judge's ruling of November 13, 1991, is without merit. State Farm is not required to defend or indemnify Sanders and is not required to honor Sanders' request for property damages.

### III. *Conclusion*

For the foregoing reasons, the Court concludes that the plaintiff's Motion for Summary Judgment must be GRANTED.

---

4. As State Farm observes in the Memorandum in Support of its Motion for Summary Judgment, when Sanders failed to respond to State Farm's Second Request for Admissions, the same were deemed admitted as a matter of law pursuant to Rule 36(a) of the Federal Rules of Civil Procedure.