25 F.3d 484
 FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC., Plaintiff-Appellee,
v.
EVERETT I. BROWN COMPANY, L.P., Eugene L. Brown, Kenneth W.
Brown, Joseph S. Brown and Sol C. Miller,
Defendants-Appellants.
 No. 93-2959.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 10, 1994.
Decided May 25, 1994.
Rehearing Denied June 23, 1994.
 
 Mark R. Smith, Smith & Bemenderfer, Indianapolis, IN (argued), for plaintiffs-appellees.
 Randolph A. Leerkamp, Carter & Leerkamp, Indianapolis, IN (argued), for defendants-appellants.
 Before POSNER, Chief Judge, EASTERBROOK and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 James and Judith Hall filed suit in federal court in West Virginia alleging that James had been wrongfully terminated by Landeco, Inc. and its parent, Everett I. Brown Company,[1] both Indiana entities.[2] At the time of his discharge, James alleged that he and his family were covered by a group health plan paid for by the Brown Company. The Halls state in their amended complaint that James's employment was terminated because the Brown Company did not want to continue paying medical expenses under its group health plan for the treatment of the Halls' son, Todd Hall. According to the amended complaint, Todd had been severely injured in a skateboarding accident and was expected to continue incurring substantial medical expenses. The amended complaint also alleges that the Brown Company refused to issue James a "converted policy of insurance" in violation of the Employee Retirement Income Security Act ("ERISA") and West Virginia law.
 
 
 2
 According to the amended complaint, Landeco and the Brown Company's conduct was "intentional, willful, wanton, malicious, and outrageous," and caused the following damages and injuries to the Halls:
 
 
 3
 (1) loss of the family home
 
 
 4
 (2) loss of past and future wages
 
 
 5
 (3) loss of family income
 
 
 6
 (4) loss of future medical coverage for James Hall, Todd Hall, and the rest of the Hall family
 
 
 7
 (5) payment of medical expense that would have otherwise been paid by Landeco and the Brown Company
 
 
 8
 (6) severe mental anguish and emotional distress
 
 
 9
 (7) reasonable attorney's fees.
 
 
 10
 Additionally, Judith Hall alleged the loss of services and consortium of her husband.
 
 
 11
 The Brown Company and Landeco asked Fidelity and Guaranty Insurance Underwriters, Inc. ("F & GIU"),[3] to defend them against the Hall's lawsuit. Landeco and the Brown Company had purchased several different insurance policies from F & GIU. F & GIU tendered a defense to Landeco and the Brown Company, but reserved its right to litigate the issue of whether it had a duty to defend or indemnify the Brown Company under the terms of the insurance policies. Consistent with its reservation of rights, F & GIU filed this declaratory judgment action in the district court seeking a declaration that it had no duty to defend or indemnify Landeco or the Brown Company in connection with the Hall's lawsuit. F & GIU, Landeco, and the Brown Company all filed motions for summary judgment.
 
 
 12
 In support of its summary judgment motion and in opposition to F & GIU's summary judgment motion, the Brown Company submitted the affidavit of general partner George X. Cannon. In his affidavit, Cannon states that the Brown Company did not own Landeco, i.e., Landeco "was not a wholly owned subsidiary" of the Brown Company. Cannon further states that the Brown Company "did not pay the medical expenses of James A. Hall's son pursuant to a group health plan as alleged by the Halls in their Amended Complaint." According to Cannon, the Brown Company only paid health insurance premiums to a trust called the "Everett I. Brown Company, Midstates Engineering Employee Welfare Plan." Cannon further states that the Brown Company "had nothing to do with the termination of James A. Hall" and "did not intend to commit any act whatsoever which" it "expected or intended to result in bodily injury to James A. Hall or Judith Hall."
 
 
 13
 The district court issued an order granting F & GIU's motion for summary judgment and denying Landeco and the Brown Company's summary judgment motions. According to the court, F & GIU did not have a duty to indemnify or defend Landeco or the Brown Company because:
 
 
 14
 (1) the Halls' various theories of recovery do not allege an "occurrence" as that term is defined by the Special Multi-Peril Policy which USF & G delivered to Landeco and Brown Co.; (2) the Halls' various theories of recovery do not allege an "occurrence" as that term is defined by the Excess Policy which USF & G delivered to Landeco; and (3) the Halls' various theories of recovery do not allege "bodily injury by accident or bodily injury by disease" as those terms are employed in the Workers Compensation and Employers Liability Policy which USF & G provided to Landeco and the Brown Co.
 
 
 15
 On the same day, the district court entered judgment in favor of F & GIU and against Landeco and the Brown Company. The Brown Company, but not Landeco, now appeals the district court's decision.
 
 Standard of Review
 
 16
 We review de novo a district court's grant of summary judgment, viewing the record in the light most favorable to the non-moving party. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir.1992).
 
 Discussion
 
 17
 In diversity cases, "we must apply the state law that would be applied in this context by the" Indiana Supreme Court. Kaplan v. Pavalon & Gifford, 12 F.3d 87, 89 (7th Cir.1993) (citing Green v. J.C. Penney Auto Ins. Co., 806 F.2d 759, 761 (7th Cir.1986)). In Indiana, the clear and unambiguous language of an insurance policy must be given its plain and ordinary meaning. City of Muncie v. United Nat'l Ins. Co., 564 N.E.2d 979, 982 (Ind.Ct.App.1991). However, if insurance policy terms are ambiguous, they must be construed in favor of the insured and against the insurer. Indiana Farmers Mut. Ins. Co. v. Graham, 537 N.E.2d 510, 511 (Ind.Ct.App.1989). "Under Indiana law, an insurance policy is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language." Eli Lilly and Co. v. Home Ins. Co., 482 N.E.2d 467, 470 (Ind.1985).
 
 Occurrence
 
 18
 We begin our analysis by examining the plain language of the insurance policy. The SMP policy provides liability coverage for bodily injury or property damage "caused by an occurrence." The term "occurrence" is defined in the SMP policy as follows:
 
 
 19
 Occurrence means an accident ... which results in bodily injury or property damage neither expected or intended from the standpoint of the insured....
 
 
 20
 "The first term that requires analysis is 'accident,' because in order to be an 'occurrence' the action must be an 'accident.' " Red Ball Leasing, Inc. v. Hartford Accident & Indem. Co., 915 F.2d 306, 309 (7th Cir.1990). "Accident" is not defined in the SMP policy. Neither has it been interpreted by the Indiana courts in relation to its use in this definition of "occurrence," which is standard throughout the insurance industry.[4] However, the term "accident" is generally defined under Indiana law as a "sudden, unexpected event." Beckerman v. Gordon, 614 N.E.2d 610, 613 (Ind.Ct.App.1993) (citing Kerchner v. Kingsley Furniture Co., 478 N.E.2d 74, 76-77 (Ind.Ct.App.1985)).
 
 
 21
 F & GIU argues that it has no duty to defend the Brown Company because the Halls' complaint alleges intentional conduct which is not an "accident" and consequently not an "occurrence."
 
 
 22
 In Red Ball Leasing, we held that intentional acts are not "accidents," as that term is used in the standard insurance policy definition of "occurrence." In that case, Red Ball sold four trucks to Bob Luttrell. The trucks were financed through Red Ball, who retained a security interest in them. Thereafter, Red Ball repossessed the trucks because of an accounting system error which indicated that Luttrell was in default on his truck payments. Luttrell then filed suit against Red Ball for "intentional and negligent conversion of the trucks, breach of contract, intentional interference with business, and conspiracy to interfere with business." 915 F.2d at 308. Red Ball asked the Hartford Accident and Indemnity Company to defend it against Luttrell's suit, but Hartford refused. Red Ball eventually settled its lawsuit with Luttrell for $100,000 and incurred $13,240 in legal fees. Red Ball then brought suit in an Indiana federal court, alleging that Hartford's refusal to defend or indemnify it constituted breach of an insurance contract.
 
 
 23
 Red Ball filed a motion for summary judgment, which the district court granted. The district court, applying Indiana law, held that Luttrell's lawsuit did not allege an "occurrence" under the terms of Red Ball's insurance policy because Luttrell's injury was "the natural result of the voluntary and intentional act of repossession." Id. On appeal, we affirmed the district court's decision. Acknowledging that Red Ball may have honestly believed that it had a legal right to repossess the trucks, we nonetheless held that "the decision to take the trucks--an intentional act of Red Ball--[was] not an 'accident' under the terms of the insurance policy."[5] Id. at 312.
 
 
 24
 Our decision in Red Ball Leasing would appear to dictate the outcome of this case because the Halls' complaint charges the Brown Company with intentional misconduct (termination of employment and refusal to issue a converted policy of insurance), which caused them injury. The Brown Company argues, however, that our holding in Red Ball Leasing is not supported by Indiana law.
 
 
 25
 In support of its argument, the Brown Company cites us to Auto-Owners Ins. Co. v. Stroud, 565 N.E.2d 1093 (Ind.Ct.App.1991). In that case, Randall Stroud was "standing guard" at his mother's store when he was awakened by someone attempting to enter the building using a bar. In response, "Randall fired one shot at the door, aiming approximately a foot and one half from the bottom of the door." Id. at 1094. Randall's shot struck the knee of eleven year-old Randy Foster, who was attempting to burglarize the store. Foster's parents filed suit against the Strouds. Thereafter, the insurance company filed a declaratory judgment action, seeking a determination that it was not required to defend or indemnify the Strouds. The insurance company's motion for summary judgment was denied, and after a bench trial, the trial court found that the insurance company was required to defend and indemnify the Strouds.
 
 
 26
 On appeal, the insurance company argued that "the injury to the youth [Randy Foster] was intended or at least expected when Randall shot at the door knowing someone was on the other side." Id. at 1095. The Indiana Court of Appeals, interpreting the same definition of "occurrence" as the one involved in this case, rejected the insurance company's argument. The court refused to overturn the trial court's determination that Foster's injury was "neither expected nor intended from the standpoint of the Strouds." Id. Based on Randall's statement that he fired the shot simply to "scare the intruder away," the appeals court affirmed the trial court's finding that Randall did not have an actual intent to injure Randy Foster. Id. The court of appeals also held that Randall's conduct was not such that intent to cause harm should be inferred as a matter of law. Nor had the insurance company proved that Randall expected to cause Randy Foster's injury because there was no evidence that "Randall had a conscious awareness that an injury was practically certain to occur." Id. at 1096.
 
 
 27
 The Brown Company also cites us to Bolin v. State Farm Fire and Casualty Co., 557 N.E.2d 1084 (Ind.Ct.App.1990). In Bolin, the insurance company filed a declaratory judgment action seeking a declaration that it had no duty to defend or indemnify the Bolins in connection with a lawsuit filed by Samuel Compton. Compton was injured when Gerald Bolin fired a pellet gun at Compton's tractor/trailer as Compton traveled down a state highway. The insurance company argued that it had no duty to defend or indemnify the Bolins because the policy excluded coverage for "bodily injury ... which is expected or intended by an insured." Id. at 1084. The trial court granted summary judgment in favor of the insurance company. The Indiana Court of Appeals reversed.
 
 
 28
 The court of appeals acknowledged that Gerald intentionally fired at Compton's truck. Moreover, the court found that one of Gerald's statements indicated that he "had a conscious awareness that someone could be injured as a result of his conduct." Id. at 1087. Nevertheless, the court found that there was a material issue of fact as to whether Gerald "expected or intended" to cause Compton's injury. According to the court, the insurance company had not established beyond dispute that Gerald had a "conscious awareness" that Compton's injury was "practically certain to occur." Id.
 
 
 29
 At first glance, it may appear that Bolin and Stroud are inconsistent with Red Ball Leasing. However, a more exacting look reveals that these cases are not inconsistent. In both Bolin and Stroud, the insurance companies argued that there was no "occurrence" because the insured had "expected or intended" to cause the injury in question. In Red Ball Leasing, however, the insurance company did not argue that the insured "expected or intended" to cause injury. Rather, the insurance company contended that there was no "occurrence" because Red Ball had engaged in intentional conduct which was not an "accident." In essence, the Indiana courts have focused on different terms in the definition of "occurrence" than we have.
 
 
 30
 Moreover, the Indiana Supreme Court recently held that intentional conduct is not "accidental" and thus not an "occurrence." In Transamerica Ins. Servs. v. Kopko, 570 N.E.2d 1283 (Ind.1991), Kopko, acting in his capacity as a developer of a subdivision, received a report that compressibility problems existed in the sub-soil of the sub-division. The report recommended "foundational and footing specifications as well as removal and replacement of compressed organic peat material before any building was undertaken on the property." Id. at 1284. Subsequently, Waggoner Builders purchased Lot 98 of the subdivision and cured the sub-soil problem through extensive excavation and backfilling of more suitable soil. Waggoner then purchased Lot 96, and was given a credit against the purchase price of the new lot to compensate for expenses it incurred in correcting the sub-soil problem on Lot 98. Waggoner then built a house on Lot 98, but failed to correct the soil conditions. Nonetheless, it sold the house to Thomas and Ruthann Reynolds. As a result of the sub-soil problem, the Reynolds' house settled, causing damage to the house.
 
 
 31
 The Reynolds then sued Kopko, Waggoner and others. Kopko asked Transamerica to defend him against the Reynolds' lawsuit. Transamerica refused, contending that the Reynolds' suit did not arise out of an "occurrence" as defined in Kopko's policy. The Indiana Supreme Court agreed with Transamerica that no "occurrence" was alleged:
 
 
 32
 We cannot see how the damage to the Reynolds' home could be construed as an 'occurrence' under the insurance contract. Kopko had received the soil report long before the Reynolds' house was built. With full knowledge of the report, Kopko sold Lot 98 to Waggoner who incurred additional expense in preparing the lot for construction due to the unstable sub-soil. When Waggoner purchased Lot 96, Kopko reimbursed him for the expenses he previously had incurred. Given this set of circumstances, we cannot say that as far as Kopko was concerned the damage to the Reynolds' house was "an accident ... neither expected or intended from the standpoint of the insured."
 
 
 33
 Id. at 1284-1285. According to the court, the theory of the Reynolds' complaint "sounds entirely in intentional tort and fraud" and therefore under this theory, "the occurrence of the subsidence of the house certainly was not 'an accident neither expected nor intended' so far as Kopko was concerned." Id. at 1285.
 
 
 34
 The Indiana Supreme Court's Kopko decision is consistent with our holding in Red Ball Leasing. Thus, an insured's intentional conduct is not an "accident" and not an "occurrence" as that term is used in most insurance policies. Here, the Halls' complaint clearly alleges that the Brown Company's intentional misconduct caused them injury. However, the Brown Company contends that F & GIU was required to determine its duty to defend based on the underlying facts of the Halls' suit, not just the theory alleged in the complaint.
 
 
 35
 According to the Brown Company, the underlying facts disclose that the Halls could not have been injured by the Brown Company's intentional conduct. George Cannon's affidavit states that the Brown Company had nothing to do with the termination of James Halls' employment. Thus, the Brown Company contends that if it "produced an unfortunate result for the Halls it had to have been because of carelessness, unawareness, ignorance, or a combination of cause." In other words, any possible injury suffered by the Halls was the result of an "accident" and not the Brown Company's intentional misconduct.
 
 
 36
 We must reject the Brown Company's argument. In what appears to be a dramatic departure from prior cases decided by the Indiana Court of Appeals, the Indiana Supreme Court held in Kopko that an insurance company's "duty to defend is determined solely by the nature of the complaint." Kopko, 570 N.E.2d at 1295. As discussed earlier, the complaint in Kopko alleged intentional and fraudulent conduct. However, Kopko claimed that the insurance company still owed him a defense because he had testified that "he 'forgot' about the sub-soil condition," and thus was merely negligent. Id. The Indiana Supreme Court rejected Kopko's argument:
 
 
 37
 Kopko's attempt to defend and to explain his action by saying he merely "forgot" is possibly a matter of defending against the allegations in the Reynolds' complaint. However, it does not change the theory of that complaint, which sounds entirely in intentional tort and fraud. Whether in subsequent litigation he may convince a jury that his forgetfulness should excuse him, this does not change the theory of the plaintiffs' case, upon which Transamerica is entitled to rely in declining to defend Kopko for his alleged deliberate and fraudulent conduct. Under the theory of the complaint, the occurrence of the subsidence of the house certainly was not "an accident neither expected nor intended" as far as Kopko was concerned.
 
 
 38
 Id.
 
 
 39
 The Brown Company does alert us to two troubling aspects arising from the Kopko decision. First, the Indiana Supreme Court cites Cincinnati Ins. Co. v. Mallon, 409 N.E.2d 1100 (Ind.Ct.App.1980), for the proposition that "[t]he duty to defend is determined solely by the nature of the complaint." Kopko, 570 N.E.2d at 1285. However, certain language in the Mallon case may be read to support the opposite conclusion. For instance, the Mallon case states that "[t]he insurance company may go beyond the face of the complaint, and refuse to defend based upon on the factual underpinnings of the claim." Mallon, 409 N.E.2d at 1105 (citation omitted). Yet, the Mallon case does say that "it is the nature of the claim and not its merits that determines the duty to defend." Id.
 
 
 40
 Also giving rise to some confusion is Trisler v. Indiana Ins. Co., 575 N.E.2d 1021 (Ind.Ct.App.1991), an Indiana Court of Appeals case decided only two and one half months after Kopko. There, the Indiana Court of Appeals stated the following:
 
 
 41
 The insurer's duty to defend is determined from the allegations of the complaint coupled with those facts known to or ascertainable by the insurer after reasonable investigation. Accordingly, in evaluating the factual basis of a claim and the insurer's concomitant duty to defend, this court may properly consider the evidentiary materials offered by the parties to show coverage or exclusion. If the pleadings fail to disclose a claim within the coverage limits or one clearly excluded under the policy, and investigation also reveals the claim is outside the coverage of the policy, no defense will be required.
 
 
 42
 Id. at 1023 (citations omitted).
 
 
 43
 However, even if these two Indiana Court of Appeals cases are in fact inconsistent with Kopko, we are bound to rely on the decision of the Indiana Supreme Court.
 
 
 44
 We therefore conclude that F & GIU was entitled to rely on the theory of the Halls' complaint in determining whether it had a duty to defend the Brown Company. As discussed earlier, the complaint alleges intentional conduct, which is not an "accident" and thus not an "occurrence" under the terms of the policy.
 
 Illusory Coverage
 
 45
 Finally, the Brown Company argues that the SMP policy's coverage is illusory.[6] In Indiana, illusory insurance coverage is disfavored as a matter of public policy. Meridian Mut. Ins. Co. v. Richie, 540 N.E.2d 27, 31 (Ind.1989), vacated, 544 N.E.2d 488 (Ind.1989). "Where an otherwise unambiguous insurance clause provides only illusory coverage when construed within the insurance contract in its entirety, the courts of this state will enforce the provision so as to give effect to the reasonable expectation of the insured." Landis v. American Interinsurance Exch., 542 N.E.2d 1351, 1354 (Ind.Ct.App.1989) (citing Richie, 540 N.E.2d at 30-31). An insurance policy is considered illusory in Indiana only if "a premium was paid for coverage which would not pay benefits under any reasonably expected set of circumstances." Richie, 540 N.E.2d at 30; City of Lawrence, 626 N.E.2d at 480.
 
 
 46
 Here, it is obvious that the SMP Policy F & GIU sold the Brown Company provides coverage in many different circumstances. It provides coverage for negligent, non-intentional acts, which result in bodily injury or property damage neither "expected or intended" by the Brown Company. The majority of insurance policy claims, such as those arising from most automobile accidents, involve negligent, non-intentional conduct. Thus, the SMP policy is not illusory.
 
 Conclusion
 
 47
 For all of the foregoing reasons the decision of the district court is AFFIRMED.
 
 
 
 [1]
 The defendants-appellants are referred to collectively as "the Brown Company."
 
 
 [2]
 At oral argument, we asked the parties to supplement the record to identify the citizenship of the Brown Company's limited partners. The parties have done so, and we find that complete diversity of citizenship exists
 
 
 [3]
 This suit was originally brought in the district court by The United States Fidelity and Guarantee Company ("USF & G"), however, the parties filed a joint motion to substitute F & GIU, a wholly-owned subsidiary of USF & G, as the real party in interest pursuant to Fed.R.App.P. 43(b). Because the only insurance policy at issue on appeal is the Special Multi-Peril Policy ("SMP") policy issued by F & GIU, we granted the parties' motion on February 2, 1994. For convenience, we refer to the plaintiffs as F & GIU
 
 
 [4]
 See City of Jasper, Ind. v. Employers Ins. of Wausau, 987 F.2d 453, 454 (7th Cir.1993)
 
 
 [5]
 Two other recent federal cases follow our holding in Red Ball Leasing. See City of Jasper v. Employers Ins. of Wausau, 987 F.2d 453 (7th Cir.1993) (finding that an insurance company had no duty to defend the City against a suit alleging that the City negligently issued two building permits, because issuing the permits was an intentional act and thus not an "accident" covered by the policy); Allstate Ins. Co. v. Norris, 795 F.Supp. 272 (S.D.Ind.1992) (no "accident" and thus no duty to defend where the insured fired several shots in an attempt to "pin down" an unidentified man, but struck a passerby instead)
 
 
 [6]
 The parties refer to the Brown Company's argument as one based on the "Doctrine of Reasonable Expectations." However, our review of the relevant case law reveals that this argument is actually referred to in Indiana under the rubric of "illusory coverage." See City of Lawrence v. Western World Ins. Co., 626 N.E.2d 477, 479-480 (Ind.Ct.App.1993) (discussing Davidson v. Cincinnati Ins. Co., 572 N.E.2d 502 (Ind.Ct.App.1991), the only case cited by the Brown Company in its opening brief in support of its "reasonable expectations argument," under the heading "Illusory Coverage")